FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAR 0 8 2019

SEAN F. McAVOY, CLERK
_____ DEPUTY
SPOKANE, WASHINGTON

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,* DIANE FRANCISCO,<br><br>          PLAINTIFF,<br>  VS.<br><br>AMERICAN FINANCIAL NETWORK, INC., JACK SHERMAN, and JOHN SHERMAN,<br><br>          DEFENDANTS. | ) CASE NO. 2:19-CV-00075-SAB<br>)<br>) QUI TAM COMPLAINT AND<br>) DEMAND FOR A JURY TRIAL<br>)<br>) FILED UNDER SEAL<br>) PURSUANT TO<br>) 31 U.S.C. §§ 3729 *et seq.*<br>)<br>)<br>) |

1.     Relator Diane Francisco ("Relator") brings this qui tam action in the name of the United States of America, by and through her undersigned attorneys Thomas & Solomon LLP, and alleges as follows:

## INTRODUCTION

2.     This is a civil fraud action by qui tam Relator on behalf of the United States ("the Government"), against American Financial Network, Inc., Jack Sherman, and John Sherman (collectively "AFN" or "Defendants") to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-

QUI TAM COMPLAINT - 1

3733, for damages sustained by the United States Department of Housing and Urban Development ("HUD"), the Federal Housing Administration ("FHA"), and the United States Department of Veteran Affairs ("VA") in connection with AFN's origination, underwriting, and quality control of FHA and VA loans (collectively "government loans") under the FHA and VA programs (individually and collectively, the "Government Programs").

3.     The FCA provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

4.     Under the FCA, liability attaches when a defendant submits or causes another to submit a claim for payment from Government funds that the defendant knows is unwarranted and when false records or statements are knowingly made or used for obtaining approval of a false or fraudulent claim for Government funds.

5.     Liability also attaches under the FCA when a defendant knowingly makes, uses, or causes to be made, a false record or statement to conceal, avoid or decrease an obligation to pay to the Government.

6.     The FCA permits any person having information regarding a false or fraudulent claim for payment from Government funds to bring an action for himself as the Relator and for the Government and allow him to share in any recovery.

7.     The FHA promotes American homeownership through its Direct

QUI TAM COMPLAINT - 2

Endorsement ("DE") Lender Program or "DE Program."

8.    FHA is a part of HUD and is one of the largest mortgage insurers in the world.

9.    Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured millions of home loans since FHA's inception.

10.    Similarly, the VA promotes home ownership for veterans, active duty personnel, certain surviving spouses, and reservists through the VA Home Loan Guaranty Program ("VA Program").

11.    Under the VA Home Loan Guaranty Program, the VA provides a guarantee of up to 50% of the loan, which protects the lender against loss up to the amount guaranteed.

12.    Under the Government Programs, if a homeowner defaults on a government loan and the mortgage holder forecloses on the property, the Government Programs will pay the mortgage holder the balance of the loan (or in the case of VA loans, up to 50% of the loan) and assume ownership and possession of the property.

13.    By protecting mortgage holders against defaults on mortgages, the Government Programs encourage lenders to make loans to millions of creditworthy citizens who might not otherwise be able to secure a home loan under conventional underwriting criteria.

QUI TAM COMPLAINT - 3

14.    Government insurance is also valuable in the secondary markets, as government loans are expected to have met stringent underwriting requirements and because they are backed by the full faith and credit of the United States.

15.    Thus, for each loan underwritten, the government extends its full faith and credit to insure the loan, and that governmental insurance, and the concomitant risk to the Treasury for default, was extended on every endorsed loan, whether the loan defaulted or not.

16.    In addition, the taxpayer has been required to fund the insurance premiums for the Government Programs.

17.    Further, the government incurs significant administrative costs in running the Government Programs and accepting endorsed loans by AFN.

18.    In addition, the government paid claims on any loan that defaulted, including loss mitigation costs associated with the foreclosure or resale of properties, such as marketing expenses, real estate taxes, and maintenance costs.

19.    The government insures the government program loans only if the Direct Endorsement Lender certifies to the government that the loan specifically, and the Direct Endorsement Lender's loan program in its entirety, meet the requirements set forth by the government.

20.    For these loans, the government guarantees that mortgage holders will be reimbursed by the government (in full for FHA loans, and up to 50% for VA loans) if the borrower ultimately does not repay the loan.

QUI TAM COMPLAINT - 4

21.    The Government Programs encourage lenders to extend loans to creditworthy low- and moderate-income families, as well as first-time homebuyers.

22.    As part of insuring mortgage loans, the government has outsourced to FHA and VA lenders (individually and collectively, "Government Lenders") the underwriting services for the loan application; the government no longer performs its own underwriting services for governmentally insured mortgage programs.

23.    In addition to performing underwriting services as part of the program, the Government Lenders also profit from any loan approved.

24.    Further, because the government insured each loan endorsed by the Government Lenders, the Government Lenders suffer no risk of loss if the loan fails.

25.    That means that built into the government mortgage program is a strong incentive for a Government Lender to endorse as many loans as possible, even those that are not qualified, in order to maximize profits, provided the Government Lender is not caught approving bad loans.

26.    Endorsing fewer loans (even unqualified loans) only reduces a lender's profitability and puts it at a competitive disadvantage in relation to other Government Lenders who endorse more loans whether qualified or not.

27.    Therefore, given these incentives, ensuring that Government Lenders only endorse loans that meet government mortgage requirements is an essential part of the program.

28.    Because Government Lenders are permitted to endorse loans for

QUI TAM COMPLAINT - 5

government insurance without prior government review, the government requires Government Lenders to conduct due diligence on loans before endorsing them for government insurance, and relies on the Government Lenders' certifications to the government in regards to their conduct.

29.    The Government Lender is expected and obligated to act with good faith, honesty, and fairness in its dealings with the government; to follow the government's requirements; and to certify annually, as well as on each loan file, that the lender is in compliance with government requirements.

30.    These are the basic checks that exist to check a Government Lender's self-interest to underwrite as many loans as possible, regardless to the qualifications of the files.

31.    AFN, a Government Lender approved by the government to originate and underwrite single-family residential mortgages insured by the government, knowingly approved loans that violated government rules while falsely certifying compliance with those rules.

32.    From at least 2013 to the present (the "Relevant Time Period"), AFN engaged in a regular practice of reckless origination and underwriting of government loans and falsely certified to the government that these loans were eligible for government insurance.

33.    AFN's conduct allowed it to profit from these loans, even if the borrowers defaulted on their mortgages.

QUI TAM COMPLAINT - 6

34.    As the risk was entirely on the government, when the non-complaint loans inevitably defaulted, this materialized into substantial losses to the government.

35.    AFN failed to live up to its obligations under the Government Programs.

36.    AFN's management instituted and encouraged practices that led underwriters to break HUD and VA rules and to approve ineligible loans.

37.    Some examples of these policies and practices include: paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; excluding and hiding adverse documentation; and failing to maintain an adequate quality control program.

38.    More specifically, on individual loan files, AFN's improper policies and practices included: improper calculating borrowers' income related to overtime and bonus earnings; using fraudulent rental and housing payment histories to establish borrower creditworthiness; failing to obtain the proper verifications of employment; improperly calculating the effective income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not

QUI TAM COMPLAINT - 7

regularly working at least forty hours in a week; failing to deduct unreimbursed business expenses from the net income calculations of self-employed borrowers; intentionally omitting student loan debts; failing to obtain written letters of explanation from borrowers with major indications of derogatory credit; and failing to obtain donor bank statements to verify gift fund assets.

39.     AFN established a culture that valued getting a loan endorsed for government insurance over complying with the government's rules.

40.     AFN's aim was to get loans insured by the United States and sold for a profit—even when AFN could not truthfully certify to the government that the loan qualified for government insurance.

41.     Therefore, the United States seeks treble damages and penalties under the False Claims Act for the insurance claims paid by the government for mortgages wrongfully approved for government insurance by AFN.

## JURISDICTION AND VENUE

42.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.

43.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

44.     This Court has personal jurisdiction over AFN because AFN transacts business in the Eastern District of Washington.

45.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C.§ 1395, and 31 U.S.C. § 3732(a), because AFN transacts business

QUI TAM COMPLAINT - 8

within the Eastern District of Washington.

46.    Upon information and belief, at least one claim for insurance has been submitted to the Government by AFN related to a property in the Eastern District of Washington.

47.    This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or otherwise as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4), but upon rather information from Relator.

48.    In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source as defined by the FCA.

49.    Relator has direct and independent knowledge of AFN's fraudulent activities.

50.    Relator has also voluntarily provided this information to the Government prior to filing this action as required under 31 U.S.C. § 3730(e)(4)(B).

51.    Relator shall serve on the United States a copy of this Complaint and a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

QUI TAM COMPLAINT - 9

## THE PARTIES

52.    Defendant American Finance Network, Inc. is a Direct Endorsement Lender and is authorized to, and in fact does conduct business in the Eastern District of Washington.

53.    Defendant AFN is headquartered at 10 Point Drive, Suite 330, Brea, California 92821.

54.    Defendant AFN's Lender ID with the HUD FHA program is 18352.

55.    Defendant Jack Sherman is the Chief Executive Officer of American Financial Network, Inc.

56.    Upon information and belief, Jack Sherman, in concert with others, develops and manages AFN's policies and practices regarding underwriting and origination of government loans.

57.    Defendant John Sherman is the President of American Financial Network, Inc.

58.    Upon information and belief, Jack Sherman, in concert with others, develops and manages AFN's policies and practices regarding underwriting and origination of government loans.

59.    Relator is a resident of the United States.

60.    Relator worked for AFN as a processing manager from approximately 2014 to 2015.

61.    During her employment, Relator worked extensively on underwriting

QUI TAM COMPLAINT - 10

1  governmental loans, including under the FHA and VA programs.

2      62.    Through her past work experiences, including time as an underwriter,

3  Relator has extensive knowledge of the rules and regulations applicable to FHA and

4  VA loans.

## FACTUAL BACKGROUND

6  *Civil Statutes to Combat Mortgage Fraud*

7      63.    The False Claims Act provides that a person is liable to the United

8  States Government for each instance in which the person knowingly presents, or

9  causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C.

10  § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

11      64.    The False Claims Act also makes liable any person who "knowingly

12  makes, uses, or causes to be made or used, a false record or statement material to a

13  false or fraudulent claim." 31 U.S.C. § 3729(a)(l)(B) (2010).

14      65.    The Act defines "knowingly" to mean that a person "(i) has actual

15  knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity

16  of the information; or (iii) acts in reckless disregard of the truth or falsity of the

17  information" 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(I)(A) (2010).

18      66.    The False Claims Act provides that no proof of specific intent to

19  defraud is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(l)(B) (2010).

20      67.    The False Claims Act defines the term "claim" to mean, in relevant part:

21  "any request or demand, whether under a contract or otherwise, for money or

QUI TAM COMPLAINT - 11

property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

68.    The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

69.    Any person who violates the False Claims Act is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.   31 U.S.C. § 3729(a)(G).

### HUD'S FHA Mortgage Insurance Program

70.    HUD is a cabinet-level agency of the United States.

QUI TAM COMPLAINT - 12

71.    HUD's mission is to create strong, sustainable, inclusive communities and quality affordable homes for all.

72.    HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and sustainable communities free from discrimination.

73.    FHA is a part of HUD and is one of the largest mortgage insurers in the world.

74.    Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception.

75.    Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family homebuyers originated and held by approved lenders, or mortgagees.

76.    If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD.

77.    HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default and has in fact done so repeatedly for AFN's loans.

78.    AFN, or whoever may purchase the loan from AFN, therefore suffers no loss when a borrower is unable to repay a government loan – only the government

QUI TAM COMPLAINT - 13

suffers the loss.

79. This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase.

80. Government mortgage insurance programs therefore help many creditworthy low- and moderate-income families as well as first-time homebuyers become homeowners.

81. A lender, like AFN, must apply to be a Government Lender and must be approved by the government to underwrite government-insured mortgage loans on the government's behalf.

82. This is an important responsibility because the government "does not review applications for mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a).

83. Instead, the Government Lender underwrites mortgage loans on the government's behalf and is to truthfully certify to the government that the borrower presents an acceptable credit risk for the government.

84. Thus, in underwriting the mortgage loan, the lender is to certify that the borrower and the mortgage loan meet the government's requirements for insurance and that the "proposed mortgage is eligible for insurance under the applicable program regulations." *Id.*

QUI TAM COMPLAINT - 14

85.    The Government Lender must decide whether or not to approve the borrower for a government-insured mortgage loan.

86.    After the Government Lender approves a borrower for a government-insured mortgage loan, the lender may submit the mortgage loan for government insurance (referred to as "endorsing" the loan) and as part of the submission process must also certify that the mortgage loan itself, as well as the lender's entire mortgage loan program, is fully compliant with government requirements and thus can be insured by the government insurance fund in the event that the borrower cannot repay the loan.

87.    Thus, the Government Lender must certify that the loan meets all of the government's requirements and the government relies on the DE certification to endorse the loan for government insurance.

88.    Certain Government Lenders, such as AFN, apply to, and participate in, the DE Program in which the mortgagees themselves endorse the mortgage for government insurance and retain all documentation supporting the mortgage. 24 C.F.R. § 203.6.

89.    The lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to the government only upon request. *See* Mortgagee Letter 2005-36; HUD Handbook 4000.1, II.A.1.a.i; HUD Handbook 4155.2, 8.B.1.d.

90.    A Government Lender is expected and obligated to act with the utmost

QUI TAM COMPLAINT - 15

good faith, honesty, and fairness in its dealings with the government.

91.    "Under the . . . civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business relationship' has an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor." *United States v. Bernstein*, 533 F.2d 775, 797 (2d Cir. 1976) (citing *First Nat'l Bank Henrietta v. Small Bus. Admin.*, 429 F.2d 280, 287 (5th Cir. 1970); *Mt. Vernon Coop. Bank v. Gleason*, 367 F.2d 289, 293 (1st Cir. 1966)).

92.    As a result, in addition to the specific regulatory duties addressed below, the Government Lender owes both a fiduciary duty and a duty of reasonable care to the government.

### HUD's Direct Endorsement Program

93.    The success of the DE Program depends upon proper underwriting of loan files.

94.    The DE Program is voluntary and gives lenders access to borrowers and revenue streams lenders would be unlikely to access without the support of HUD programming and FHA insurance.

95.    Participating lenders have to determine the eligibility of borrowers and loans for FHA insurance, and ensure the integrity of the data relied upon to make such determinations.

96.    Under the DE Program, HUD relies on the expertise and knowledge of the lenders.

QUI TAM COMPLAINT - 16

97.     A lender must apply to be a Direct Endorsement Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf.

98.     The government relies on the truthfulness of the certification the lender completes on each loan certifying that the loan is eligible for government insurance.

99.     As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

100.    Thus, the DE Lender, in exchange for the government's loan guarantee, provides underwriting mortgage services for HUD and determines whether a borrower presents an acceptable credit risk for HUD.

101.    After the DE Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan.

102.    A DE Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage.

103.    That responsibility includes performing due diligence and ensuring accuracy.

104.    These duties require, among other things, that the lenders exercise

QUI TAM COMPLAINT - 17

integrity, prudence, candor, and due diligence on behalf of the government when underwriting loans for government insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims. *See* HUD Handbook 4000.1, V.A.2.c.i; HUD Handbook 4155.2, 1.B.8.a; 1.B.8.b; 1.B.8.c.

105.    AFN, as a Government Lender always remains responsible for the actions of its employees that participate in government transactions. *See* FHA Annual Certifications, *infra* ¶¶ 138–41; *see also* HUD Handbook 4000.1, I.A.6.i; HUD Handbook 4155.2, 9.D.6.b.

106.    AFN, like any Government Lender, certified to the government that it was responsible for the actions of its employees. *See* FHA Annual Certifications, *infra* ¶¶ 138–41.

### *The FHA's Due Diligence Requirements*

107.    Proper due diligence is a critical component of the Direct Endorsement Program.

108.    It is required by federal regulation and HUD Handbooks.

109.    The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found.

110.    It is also required by virtue of the fiduciary duty and duty of reasonable care that the Direct Endorsement Lenders owe to HUD.  See 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by approved mortgagees is based not only

QUI TAM COMPLAINT - 18

on these regulatory requirements, but also on civil case law.").

111.   "The entire scheme of government mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found." *Bernstein*, 533 F.2d at 797.

112.   In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor.

113.   HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

114.   As a result of this fiduciary relationship, the Direct Endorsement Lenders owe the government a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with the government.

115.   A lender's due diligence should (1) "determine a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties"; and (2) "examine a property offered as security for the loan to determine if it provides sufficient collateral." HUD Handbook 4155.1, REV-5, ch. 2-1; *see also* HUD Handbook 4000.1, II.A.5.d.ii; HUD Handbook 4155.2, 2.A.4.b.

116.   Proper due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.

117.   In all cases, a Direct Endorsement Lender owes HUD the duty, as

prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

118. HUD has established specific rules for due diligence predicated on sound underwriting principles.

119. In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for Government Lenders and for which the government expects the Government Lender to fully comply. *See* HUD Handbook 4000.1, V.A.2.b.i(A)(1)(a); HUD Handbook 4155.2, 2.A.4.b.

120. At various times, the government has promulgated several handbooks detailing the rules and regulations for lenders underwriting government loans.

121. Currently, the operative handbook is the HUD Handbook 4000.1-FHA Single Family Housing Policy ("HUD Handbook 4000.1") which went into effect on approximately September 14, 2015.

122. Prior to the implementation of HUD Handbook 4000.1, the operative handbook was the HUD Handbook 4155.1 *Mortgage Credit Analysis for Mortgage Insurance on One-to-Four Family Properties* ("HUD Handbook 4155.1") which was issued in approximately May 2009.

123. As they say, these requirements set forth "the minimum standard of due

diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply. 24 C.F.R. § 203.5(c).

124.   HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C; *see also* HUD Handbook 4000.1, I.B.3.a; HUD Handbook 4155.2, 2.A.3.a.

125.   When ensuring that a borrower is creditworthy, a Direct Endorsement Lender must comply with governing requirements, such as those set forth in the HUD Handbooks. *See* HUD Handbook 4000.1, II.A.5.a; HUD Handbook 4155.2, I.A.2.a.

126.   The rules set forth in HUD Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.

127.   HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

128.   The Direct Endorsement underwriter must assume the following responsibilities:

- compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

- the review of appraisal reports, compliance inspections

and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

- the decisions relating to the acceptability of the appraisal, the inspections, the buyer's capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

- the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program;

- and awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

129.    Additionally, Direct Endorsement lenders are required to comply with the following HUD guidelines:

a.  Direct endorsement lenders may only engage in business practices that conform to generally accepted practices of prudent mortgage lenders. See FHA Title II Mortgagee Approval Handbook 4060.1, Section 2-10(D) (REV-2, August 14, 2006).

b.  Direct endorsement lenders may not engage in practices that demonstrate irresponsibility. Id.

c.  Direct endorsement lenders may only pay fees for services permitted by HUD program policy. Id. at Section 2-22.

d.  Direct endorsement lenders are required to function so as to protect the FHA from unacceptable risk. Id. at Section 7-2.

130.    The underwriter must "evaluate the mortgagor's credit characteristics, adequacy

QUI TAM COMPLAINT - 22

and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d). Mortgagees must also employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud; in addition, underwriting decisions must be performed with due diligence in a prudent manner. HUD Handbook 4000.4 REV-1, ¶ 2-4(C)(5); see also HUD Handbook 4000.1, V.A.2.c.i; HUD Handbook 4155.2, 2.A.4.b.

131.    The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters. See HUD Handbook 4000.1, I.A.3.c.iv(B)(3)(b)(ii); HUD Handbook 4060.1 REV-2, ¶2-9(A).

***Certifications and Endorsements for FHA Insurance***

132.    HUD requires Government Lenders to certify their compliance with the fiduciary, due diligence, quality control, and reporting requirements discussed herein.

133.    Direct Endorsement Lenders are required to certify their compliance with the FHA's programmatic and individual loan rules by certifying their compliance with government requirements, as well as governmental rules and regulations during their initial application to the government, on an annual basis, and on an individual loan-by-loan basis.

QUI TAM COMPLAINT - 23

*FHA Initial Certifications to HUD*

134.   First, AFN as a lender applies to participate in the Government Lender program and to endorse loans for government insurance on the government's behalf, AFN certified that it would fully comply with all governmental guidelines, regulations, and requirements:

135.   I [AFN] certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702 et seq.) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

136.   Unless AFN submits a truthful initial certification to the government, AFN would not be entitled to obtain or maintain its status as a Government Lender or to endorse loans for government insurance.

*FHA Annual Certification Requirements.*

137.   Even once AFN was initially certified, AFN must re-certify, every year, that it is complying with the government's program requirements, including due diligence in underwriting, following all governmental underwriting requirements, and the implementation of a mandatory quality control plan.

138.   As of 2010, AFN was required to annually certify:

QUI TAM COMPLAINT - 24

> I [AFN] certify that I know, or am in the position to know, whether the operations of [AFN] conform[s] to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of [AFN]. I certify that [AFN] complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, [AFN] conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that [AFN] is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for [AFN] . . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

139. As of approximately August 1, 2016, a corporate officer of AFN was required to annually certify:

> I certify that I . . . have known, or have been in the position to know, whether the operations of [AFN] conformed to all HUD regulations and requirements necessary to maintain the Mortgagee's FHA approval as codified by 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by the Mortgagee Letter, and any agreements entered into between [AFN] and HUD.

140. AFN also certifies that it is responsible for the actions of its employees, including managers, supervisors, originators, underwriters and processors:

> I acknowledge that [AFN] is responsible for all actions of its officers, partners, directors, principals, managers,

QUI TAM COMPLAINT - 25

supervisors, loan processors, loan underwriters, loan originations, and other employees of [AFN], and for the actions of any Affiliates participating in the FHA programs for or on behalf of [AFN].

141.    Currently, AFN is additionally required to certify:

I certify that, to the best of my knowledge and after conducting a reasonable investigation, [AFN] does now, and did at all times throughout the Certification Period, comply with all HUD regulations and requirements necessary to maintain [AFN's] FHA approval as codified in 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by Mortgagee Letter, and any agreements entered into between [AFN] and HUD, except for those instances of non-compliance, if any, that [AFN] reported to HUD and for which [AFN] received explicit clearance from HUD to continue with the certification process. Each of my certifications is true and accurate to the best of my knowledge. I understand that if I have made any false, fictitious, or fraudulent statement(s), representation(s), or certification(s) knowingly on this form, I may be subject to administrative, civil and/or criminal sanctions, including damages, penalties, fines, imprisonment, and debarment under applicable federal law. I acknowledge that [AFN] is now, and was at all times throughout the Certification Period, subject to all applicable HUD regulations, Handbooks, Guidebooks, Mortgagee Letters, Title I Letters, policies and requirements, as well as Fair Housing regulations and laws including but not limited to 24 CFR § 5.105, Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act) and Title VI of the Civil Rights Act of 1964.

142.    These annual certifications require compliance with the basic eligibility requirements for Government Lenders, which include compliance with the due diligence, quality control, and reporting requirements.

QUI TAM COMPLAINT - 26

*AFN's annual certifications to the FHA on its operations.*

143.    Absent a truthful annual certification, AFN is not entitled to endorse FHA loans for government insurance.

144.    Absent the applicable certifications in the annual certification described above, AFN cannot endorse loans for government insurance.

145.    Unless AFN had submitted a truthful annual certification, AFN is not entitled to receive the government's financial backing of that mortgage, including the pledge of the government's full faith and credit for backing such mortgages.

146.    The annual certification is material to the government's payment of any claim submitted under the Government Lender Programs.

147.    The government does not generally review lenders' operations; instead, it relies on lenders such as AFN to comply with the government's operational requirements and to ensure that the operational requirements are met.

148.    The certifications are required for AFN to enter and remain in the Government Programs.

149.    AFN's certifications are critical to the government's ability to ensure that only qualified and eligible loans are endorsed for government insurance.

150.    AFN's certifications are essential for a claim on a loan to be submitted for government insurance.

151.    And AFN's certifications are needed to protect the government insurance fund from undue risk and loss.

QUI TAM COMPLAINT - 27

*FHA Individual Loan Certifications.*

152.  AFN must also submit a certification to the government for each loan for which it endorses for government insurance ("loan-level certifications").

153.  This is a certification to HUD that the individual loan complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD 92900-A.

154.  This loan-level certification can occur in two ways.

155.  One, AFN may use a government-approved automated underwriting system to review loan applications.

156.  An AUS is a software system that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL."

157.  Numerous requirements promulgated by the government explain how AFN must calculate each data point and what documentation it needs to support each data point.

158.  For each loan that was underwritten with an AUS, AFN must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." See FHA TOTAL Mortgage Scorecard User Guide; HUD Handbook 4000.1 II.A.4.a.iii(A)(1); HUD Handbook 4155.2 2.A.3.d.

159.  AFN must further certify that "there was no defect in connection with the approval of this mortgage such that the result reached in TOTAL should not have

QUI TAM COMPLAINT - 28

been relied upon and the mortgage should not have been approved in accordance with FHA requirements." See Form HUD 92900-A.

160.   The automated underwriting system processes information entered by AFN and rates loans as either "accept/approve" or a "refer/caution."

161.   Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS [is] true, complete, properly documented, and accurate." See FHA TOTAL Mortgage Scorecard User Guide.

162.   It is AFN's responsibility to ensure the integrity of the data relied upon by TOTAL. See Mortgagee Letter 2004-1. In cases where AFN used a government-approved automated underwriting system, and the system rates a loan as an "accept" or "approve," AFN made the following certification:

> This mortgage was rated as an "accept" or "approve" by FHA's Total Mortgage Scorecard. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program. I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

163.   However, in cases where AFN uses a government-approved automated underwriting system, and the system rates a loan as "refer" or "caution," or when AFN does not use a government-approved automated underwriting system, AFN

must make the following certification, in sum and substance:

> This mortgage was rated as a "refer" or "caution" by FHA's Total Mortgage Scorecard, and/or was manually underwritten by a Direct Endorsement underwriter. As such, the undersigned Direct Endorsement Underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

164. The certifications in HUD Handbook 4000.4, incorporated by reference in the certifications above, include AFN's certification that the mortgage complies with the government's underwriting requirements contained in all outstanding Handbooks and Mortgagee Letters.

165. Specifically, AFN certified that:

> i.      The proposed mortgage meets the income and credit requirements of the governing law in the lender's judgment.

> ii.     AFN used due diligence in underwriting the mortgage.

> iii.    That the statements made in its application for insurance are true and correct.

> iv.     AFN's statements made in the Lender's Certificate as part of the Direct Endorsement Approval for a HUD/FHA Insured Mortgage are true and correct.

> v.      AFN's underwriter makes all certifications required by Direct Endorsement Handbook, which include:

QUI TAM COMPLAINT - 30

1. The mortgagor's monthly mortgage payments will not be in excess of his or her reasonable ability to pay. 24 C.F.R. § 203.21.

2. The mortgagor's income is and will be adequate to meet the periodic payments required to amortize the mortgage submitted for insurance. 24 C.F.R. § 203.33.

3. The mortgagor's general credit standing is satisfactory. 24 C.F.R. § 203.34.

### The VA's Home Loan Guaranty Program

166.   Pursuant to the Servicemen's Readjustment Act of 1944, the VA offers mortgage assistance through the VA Program.

167.   Like FHA loans, VA-guaranteed loans are made by private lenders, such as banks and mortgage companies.

168.   To obtain a VA loan, a veteran must apply to a Government Lender.

169.   If the loan is approved, the VA will guarantee a portion of the loan, which protects the VA Lender against loss up to the amount guaranteed. The maximum amount that the VA guarantees is 50% of the loan.

170.   By partially guaranteeing loans against default, the VA loan guarantee encourages lenders to make loans to veterans, and makes the resulting loans valuable on the secondary market.

171.   Many VA Lenders, including AFN, are authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for the VA, and approve loans for the VA guarantee without prior review or approval

QUI TAM COMPLAINT - 31

by the VA.

172.   To qualify for the VA guarantee, a mortgage must meet all of the applicable VA underwriting requirements.

173.   Much like the HUD underwriting requirements, the VA underwriting requirements relate to such things as the borrower's income and assets, the borrower's credit history, and the valuation of the subject property.

174.   In underwriting loans and evaluating whether to approve loans for the VA guarantee, VA Lenders are required to follow the VA's applicable underwriting guidelines. See VA Lenders' Handbook, VA Pamphlet 26-7 at Ch. 4, see also 38 C.F.R. § 36.4340.

175.   The VA's underwriting guidelines contain rules that must be followed to ensure that each borrower's "present and anticipated income and expenses, and credit history[,] are satisfactory" such that the borrower "is a satisfactory credit risk." 38 C.F.R. § 36.4340.

176.   Further, for a loan to be entitled to coverage under the VA program, the VA requires that all loans be underwritten by an underwriter with a SAR number, signifying that she is a VA-approved underwriter in the VA program.

177.   Under the VA regulations, a SAR underwriter must have at least three years in process, pre-underwriting, or underwriting mortgage loans, and at least one year of the most recent three years must have included underwriting decisions involving VA loans. VA Pamphlet 26-7, Ch. 1, §4.a.

QUI TAM COMPLAINT - 32

178.   Additionally, the SAR underwriter must have an Accredited Residential Underwriter designation from the Mortgage Bankers Association and must be familiar with the VA's credit underwriting standards. *Id.*

### *VA Loan Certifications*

179.   The VA relies on Government Lenders to conduct due diligence on loans before approving them for the VA guarantee. See *id.* § 36.4340(j).

180.   To satisfy this due diligence requirement, VA Lenders must, among other things, develop all credit information; obtain all required verifications and a credit report; ensure the accuracy of all information on which the loan decision is based; and comply with all of the applicable VA underwriting guidelines. *Id.*; see VA Pamphlet 26-7 at 4-3; VA Form 26-1820.

181.   To initially participate in the VA Program, each VA lender is required to certify compliance with the VA regulations for underwriting VA loans by submitting VA Form 26-8736.

182.   VA Form 26-8736 is an application for a lender to underwrite VA loans on an automatic non-supervised basis.

183.   As part of the express certifications made in this form, each VA lender agreed and certified that it would, amongst other things, comply with Title 38 of the United States Code, VA regulations and other directives issued by the VA; notify the VA of any change in its corporate structure, operations, or financial condition which would have a bearing on its qualifications to automatically underwrite loans;

QUI TAM COMPLAINT - 33

not close loans on an automatic basis as a courtesy or accommodation for other mortgage lenders regardless of whether or not such lenders are approved themselves to close on an automatic basis, nor will it close loans on the automatic basis for any builder, real estate brokerage firm or other entity which it owns, is owned by, is affiliated with or has a financial interest in, without the express approval of the Department of Veterans Affairs; not process loans that it does not itself intend to make; know that all prospective VA loans to be closed on an automatic basis will be reviewed and either approved or rejected by an approved underwriter; and take responsibility for all credit information; i.e., credit report, verifications of employment and deposit, and disclose the sources of such information.

184.    VA Form 26-8736 must be signed by the president or principal officer for each VA lender.

185.    Additionally, for each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must certify that it conducted due diligence to ensure that the mortgage complies with the applicable VA underwriting rules. See 38 C.F.R. § 36.4340(k).

186.    Pursuant to VA regulations, each loan approved for the VA guarantee or refinancing incorporates the following certification:

> The undersigned lender certifies that the (loan) (assumption) application, all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36; that all credit reports obtained or generated

in connection with the processing of this borrower's (loan) (assumption) application have been provided to VA; that, to the best of the undersigned lender's knowledge and belief the (loan) (assumption) meets the underwriting standards recited in chapter 37 of title 38 United States Code and 38 CFR part 36; and that all information provided in support of this (loan) (assumption) is true, complete and accurate to the best of the undersigned lender's knowledge and belief.

*Id.* at § 36.4340(k)(2)(i).

187.    Additionally, for each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must execute VA Form 26-1820, pursuant to which it further certifies, among other things, that "[t]he loan conforms with the applicable provisions of Title 38, U.S. Code, and the Regulations concerning guaranty or insurance of loans to veterans."

### *AFN's certifications to the Government Programs on individual loans*

188.    Absent a truthful loan application certification, AFN is not entitled to endorse a particular loan for government insurance.

189.    Absent the applicable certifications for an individual loan as described above, AFN cannot endorse that loan for government insurance.

190.    Unless AFN had submitted a truthful loan-level certification, AFN is not entitled to receive the government's financial backing of that mortgage, including the pledge of the government's full faith and credit for backing such mortgages.

191.    Each of the foregoing certifications is material to the government's

QUI TAM COMPLAINT - 35

1  payment of any claim submitted under the Government Lender Programs.

2      192.   The government does not review government loans for approval prior

3  to the loan being endorsed for insurance; instead, it relies on lenders such as AFN to

4  comply with the government's requirements and to ensure that every loan is in fact

5  eligible for government insurance.

6      193.   The certifications are required for AFN to enter and remain in the

7  Government Programs.

8      194.   AFN's certifications are critical to the government's ability to ensure

9  that only qualified and eligible loans are endorsed for government insurance.

10     195.   AFN's certifications are essential for a claim on a loan to be submitted

11  for government insurance.

12     196.   And AFN's certifications are needed to protect the government

13  insurance fund from undue risk and loss.

14     ***Defaulted loans result in losses to the government***

15     197.   Once a loan is endorsed by AFN, it is insured by the government on the

16  basis that that the Government Lender has followed the government requirements

17  and has submitted accurate certifications and that the loan is eligible for government

18  insurance.

19     198.   Additionally, AFN's annual certifications ensure that AFN has met all

20  of the government's requirements on both a programmatic and individual loan basis.

21     199.   Without those requirements being met, any loan submitted by AFN is

QUI TAM COMPLAINT - 36

not eligible for government insurance.

200.   It is only because a Government Lender endorses a loan for government insurance that the holder of the mortgage is able to submit a claim to the government for any losses.

201.   If the borrower defaults, the holder of the mortgage can submit a claim to the government for any loss from the default.

202.   The holder submits a claim for insurance by using HUD's electronic claim system.

203.   The claim must include certain information which is set forth on HUD form 27011 and electronic versions of the same.

204.   Each loan that is endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number.

205.   If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim.

206.   The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

207.   FHA pays these insurance claims in two parts.

208.   First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest.

209.   Second, if applicable, the mortgage holder later makes a final claim for

QUI TAM COMPLAINT - 37

1  expenses and allowances (e.g., foreclosure costs), plus interest. HUD Handbook

2  4330.4, REV-I, ch. 2-4.

3  210.  These claims are submitted to HUD electronically, and HUD's

4  electronic system processes them automatically.

5  211.  The system ensures that the FHA insurance is active with respect to the

6  FHA case number provided and that there are no other impediments (such as a no-

7  pay flag or indemnification agreement) to paying the claim.

8  212.  After processing, the claim is approved for payment, and a

9  disbursement request is sent to the United States Treasury to issue the funds via wire

10  transfer to the holder of the mortgage note.

11  213.  The damages sustained by the United States as a result claims on the

12  government resulting from AFN's conduct takes several forms.

13  214.  First, the United States sustains losses in the form of "net losses"

14  whereby the amount of proceeds received by the government from reselling the

15  foreclosed properties, or from bundling the loans for sale to an investor, is deducted

16  from the loan or claim amount.

17  215.  Additionally, any costs associated with foreclosure, resale, or sale of

18  the note, such as marketing expenses, real estate taxes, and maintenance costs, are

19  added to the claim amount.

20  216.  In other words, the loss to the government on the loans is adjusted for

21  any proceeds received by the government from the sale of the foreclosed property,

QUI TAM COMPLAINT - 38

and for any costs associated with the disposition of the property.

217.   Thus, for each loan underwritten, the government extended its full faith and credit to insure the loan, and that governmental insurance, and the concomitant risk to the Treasury for default, was extended on every endorsed loan, whether the loan defaulted or not.

218.   In addition, the taxpayer has been required to fund the insurance premiums for the FHA program.

219.   Further, the government incurs significant administrative costs in running the FHA program and accepting endorsed loans by AFN.

220.   In addition, the government paid claims on any loan that defaulted.

***AFN's national scheme to defraud the Government Programs through deliberately and recklessly approving ineligible loans for government insurance.***

221.   As described below, AFN knew, deliberately ignored, and recklessly disregarded the fact that many of its loans did not comply with the government's underwriting requirements, and thus were not eligible for government mortgage insurance.

222.   From at least 2013 to the present, AFN engaged in a regular practice of reckless origination and underwriting of government loans and falsely certified to the government that these loans were eligible for government insurance.

223.   AFN focused on maximizing these profit-making schemes across all locations in the company.

QUI TAM COMPLAINT - 39

224. In addition, AFN established national underwriting policies and practices.

225. The policies described in this complaint reflect AFN's nationwide loan and underwriting polices which are used interchangeably at all its locations.

226. For example, Relator is aware that AFN's national underwriting policies and interpretations were established by individuals such as Jude Brennan, who was AFN's Northeast Regional Operations Manager.

227. Despite the fact that Mr. Brennan worked in the Philadelphia, Pennsylvania area, Mr. Brennan discussed AFN's underwriting policies and procedures with Relator and Relator's Manager, Duane Dougan, who were located in the San Diego area.

228. Additionally, Relator is aware that emails discussing AFN's underwriting policies and practices were communicated to its underwriting staff throughout the United States.

229. From at least 2013 to the present, AFN has engaged in a regular policy and practice of reckless origination and underwriting of its government loans and falsely certified to the government that those loans were eligible for government insurance.

230. Furthermore, AFN knew of certain underwriting processes that deliberately ignored and recklessly disregarded government requirements that would result in AFN endorsing materially deficient loans for government mortgage

QUI TAM COMPLAINT - 40

insurance.

231.    Additionally, AFN pushed for increased loan volume that came at the expense of loan quality.

232.    But AFN's management failed to take effective action to address the seriously deficient loan originations and underwriting that it knew was occurring.

233.    The underlying causes of AFN's very serious loan quality problems and reckless underwriting are multifold, several of which are detailed in this Complaint.

234.    In this case, AFN instituted a series of policies that replaced its fiduciary obligation with one that maximized its profits and sales.

235.    AFN's interest was underwriting as many government loans as possible, secure in the knowledge that if it was not caught, the government would pay for any defaulted loans.

236.    The proximate and natural result of AFN's process was to endorse loans that defaulted at a significantly higher rate than comparable mortgagees, which was borne out by its statistics.

237.    AFN's policies caused it to endorse loans that defaulted at a higher rate than comparable mortgagees.

238.    AFN's government insured loans were so problematic that over the past two years, FHA loans from AFN have resulted in claims, or have seriously delinquent payments (payments over 90 days due which often signal a likely complete default on the loan) that have exceeded the national average for other

QUI TAM COMPLAINT - 41

government loan lenders at a significantly higher rate.

239.  HUD's Neighborhood Watch database provides data information for tracking the performance of loans originated, underwritten, and serviced by FHA-approved lending institutions.

240.  The system is designed to provide information about the performance of loans that are originated, underwritten and serviced by FHA-approved lending institutions by highlighting instances of high defaults and claims among lending institutions by geographic area, loan characteristic, and other factors.

241.  According to the HUD Neighborhood Watch for the two-year data of the performance period between January 1, 2014 and December 31, 2015 the rate of loans that are seriously delinquent or have resulted in claims against HUD was 1.44%, while the national average for all mortgagees was only 1.12%.

242.  Further, upon information and belief, the United States has paid at least 170 claims between 2013 and 2016 for loans submitted for FHA insurance by AFN.

***AFN's wrongful conduct violated specific HUD rules and requirements governing the origination and underwriting of FHA insured mortgages.***

243.  AFN's knowingly improper origination and underwriting of FHA mortgage loans violated numerous specific rules and requirements published by HUD.

244.  Specifically, AFN violated requirements contained or referenced in one or more of the following documents, which set forth the minimum standards for

QUI TAM COMPLAINT - 42

originating and underwriting FHA insured mortgages and with which HUD regulations required AFN to comply, see 24 C.F.R. §§ 203.5(c), (d), (e); 203.255(b)(5):

a. HUD Handbook 4155.1 Revision 5 ("REV-5"), Mortgage Credit Analysis for Mortgage Insurance, dated October 2003 and Mortgage Letters amending and clarifying the same;

b. HUD Handbook 4155.1, Mortgage Credit Analysis for Mortgage Insurance, issued May 2009 and Mortgagee Letters amending and clarifying the same; and

c. FHA Total Mortgage Scorecard User Guide dated December 2004;

d. HUD Handbook 4000.1-FHA Single Family Housing Policy

e. HUD Handbook 4000.4 REV-1, Change 2, Single Family Direct Endorsement Program, issued July 1994 and Mortgagee Letters amending and clarifying the same;

f. HUD Handbook 4060.1 REV-2, FHA Title II Mortgage Approval Handbook, issued August 2006 and Mortgagee Letters amending and clarifying the same;

g. HUD Handbook 4000.2 REV-3, FHA Mortgagees' Handbook Application Through Insurance, issued May 2004 and Mortgagee Letters amending and clarifying the same;

h. HUD Handbook 4155.2, Lender's Guide to Single Family Mortgage Insurance Processing, issued May 2009 and Mortgagee Letters amending and clarifying the same (including, but not limited to, Mortgagee Letter 2009-28);

i. HUD Handbook 4165.1 REV-2, Endorsement for Insurance for Home Mortgage Programs (Single Family),

QUI TAM COMPLAINT - 43

issued April 2005 and Mortgagee Letters amending and clarifying the same;

j. HUD Handbook 4150.1 REV-1, Valuation Analysis for Home Mortgage Insurance, issued February 1990 and Mortgagee Letters amending and clarifying the same (including, but not limited to, Mortgagee Letters 1994- 54 and 1996-26); and

k. HUD Handbook 4150.2 Change 1, Valuation Analysis for Single Family One- to Four-Unit Dwellings, issued July 1999 and Mortgagee Letters amending and clarifying the same.

245. Compliance with these Handbooks, Mortgagees Letters, and other documents (such as the TOTAL User Guides), is expressly incorporated into the Code of Federal Regulations and these documents have the force of law. See 24 C.F.R. § 203.5(c).

246. AFN's violations of these authorities as to specific loans rendered AFN's certifications on the loans' HUD Forms 92900-A false. HUD Form 92900-A, HUD/VA Addendum to Uniform Residential Loan Application, dated June 2005 and revisions of the same; see, e.g. 24 C.F.R. § 203.255(b)(5).

247. These falsities were material to and rendered false the ultimate submission of mortgage insurance claims on the loans, including because the claims were made on mortgage insurance that was fraudulently induced and because such claims contained misleading half-truths. Specifically:

a. That is, by certifying a loan's compliance with the above authorities at the time of endorsement (when the loan did not so comply), AFN falsely and fraudulently

induced HUD to insure the loan (rendering any insurance claim on that loan false).

b.    Further, a claim presented by AFN on HUD Form 27011 or its electronic counterpart for a loan that AFN falsely endorsed for FHA mortgage insurance gave an FHA case number and the date of the loan's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance pursuant to the above authorities and that FHA could contest the contract for insurance and not pay the claim, pursuant to 12 U.S.C. § 1709(e), because of AFN's fraud or misrepresentation in originating the loan.

c.    Lastly, a claim presented by a subsequent holder of a loan on HUD Form 27011 or its electronic counterpart that AFN falsely endorsed for FHA mortgage insurance gave an FHA case number and the date of the loan's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance pursuant to the above authorities because AFN failed to disclose that the loan did not qualify for FHA insurance.

***AFN falsely represented to the Government that it was not paying commissions to employees performing underwriting services.***

248.    Government regulations do not allow a Mortgagee to compensate an employee who performs underwriting functions with commissions. *See* HUD Handbook 4000.1, 1.A.3.c.iv.(B)(3)(b)(ii); HUD Mortgagee Approval Handbook 4060.1, 2-9(A).

249.    Therefore, AFN, as a mortgagee, "must not compensate employees who perform underwriting…activities on a commission basis." *Id.*

250.    This helps to ensure that employees performing underwriting functions

QUI TAM COMPLAINT - 45

are making decisions completely on the merits of the individual file and not incentivized to approve mortgages because of the potential to be paid a commission.

251.    Government regulations also prohibit an employee from having multiple sources of compensation, either directly or indirectly, from a single FHA-insured transaction. *See* HUD Handbook 4000.1, 1.A.3.c.iv.(B)(3)(b)(v).

252.    Further, AFN agreed to follow such regulations.

253.    AFN, however, as part of its scheme to profit off of government subsidized mortgage insurance, knowingly compensated its employees who performed underwriting activities on governmental files on a commission basis in order to get as many files approved as possible, even when those files did not meet the government's requirements.

254.    AFN only paid the commission if the employee approved the file and it was funded for government insurance.

255.    This amounted to a "kick-back" from AFN to its employees when a loan was approved and created a conflict of interest because the employee's compensation was dependent on both supposedly meeting government requirements, as well as trying to get the loan endorsed even it did not meet those requirements.

256.    AFN's improper commissions system existed throughout the entire duration of Relator's employment with AFN.

257.    Given that AFN knew, or should have known, that its commission

QUI TAM COMPLAINT - 46

payment plan did motivate the endorsement of non-qualified applicants, regardless of the regulations' requirements, AFN's conduct was improper for a government lender.

258.  Further, AFN's representations to the government that it was not engaging in such conduct are false.

**AFN falsely represented to the government that it was not pressuring employees to endorse bad loans.**

259.  Proper due diligence is a critical component of the Direct Endorsement Program. *See* HUD Handbook 4000.1, II.A.5.d.ii; HUD Handbook 4155.2 2.A.4.b.

260.  It is required by federal regulation and government handbooks.

261.  AFN, however, as part of its scheme to profit off of government subsidized mortgage insurance, knowingly pressured employees to endorse loans that should be endorsed with due diligence and then repeatedly certified to the government that it was not doing so.

262.  Put simply, AFN is required to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

263.  Contrary to these requirements, AFN improperly pressured employees through a series of policies and practices.

264.  These policies and practices included: establishing quotas; threatening

QUI TAM COMPLAINT - 47

1  employees that they would lose their jobs if certain loan volumes were not met;

2  creating turnaround times that did not allow for proper underwriting; and switching

3  files to other employees if the initial individual could not get the loan approved.

4      265.   AFN knew these policies and practices did not allow for the proper

5  underwriting of all governmental loan applications, but instead pressured for the

6  approval of unqualified files to meet those requirements.

7      266.   Relator witnessed AFN improperly pressure employees to approve

8  loans starting at the beginning of her employment with AFN and continuing

9  throughout the duration of her employment and occurring on approximately a daily

10 basis.

11     267.   Consistent with AFN's goals, AFN's pressure was meant to, and did in

12 fact, encourage employees performing underwriting functions to endorse loan

13 applications in which the applicant's qualifications did not conform to the

14 government's requirements yet still receive government insurance.

15     268.   Given that AFN knew, or should have known, that its pressure did

16 motivate the endorsement of non-qualified applicants, regardless of the regulations'

17 requirements, AFN's conduct was improper for a Direct Endorsement lender.

18     269.   Further, AFN's representations to the government that it was not

19 engaging in such conduct are false.

20

21

QUI TAM COMPLAINT - 48

*AFN falsely represented to the government that it did not have a management "override policy" under which management overrode government requirements and encouraged employees to do so as well.*

270.    Government regulations only allow for the endorsement of loans that meet all of the government lending requirements. *See* HUD Handbook 4000.1, I.B.3.a. and II.A; HUD Handbook 4060.1, 1-10.

271.    As set forth above, for each FHA loan AFN endorsed, AFN also certified that, as to the loan, there was "no defect in connection with my approval of this mortgage," and also certified that, as to that loan, it was not the case that "the mortgage should not have been approved in accordance with FHA requirements." *See* Form HUD 92900-A.

272.    Additionally, for each VA loan that AFN endorsed, AFN certified that "all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36" and that the loan "meets the underwriting standards recited in chapter 37 of title 38 United Sates Code and 38 CFR part 36."

273.    Despite being required to comply with all government requirements, AFN instead created a management override process under which management would dictate that loans being endorsed even if they did not meet the government's requirements.

274.    AFN's management was aware of the management override process, both by creating it and then making the overrides from governmental underwriting

QUI TAM COMPLAINT - 49

policies with it.

275. Relator witnessed AFN's management override governmental requirements starting at the beginning of her employment with AFN and continuing throughout the duration of her employment and occurring on nearly a daily basis.

276. The conditions that AFN overrode were material and the government would not have insured the loans for governmental insurance had it known that the conditions that AFN was overriding were not met.

277. By having management override the governmental requirements, AFN knew that it was not in compliance with the governmental regulations but falsely told the government that it was meeting those requirements.

278. Because of the management overrides, AFN succeeded in its goal of underwriting more guaranteed loans even though those loans did not qualify for insurance coverage.

***AFN falsely represented to the government that employees performing underwriting functions were not being managed by mortgage origination activities.***

279. Government regulations require that underwriters are not managed by any individual who performs mortgage origination activities. *See* HUD Handbook 4000.1, I.A.3.c.iv(B)(3)(b)(vi)

280. Similarly, Government regulations prohibit mortgage origination employees from giving anything of value to employees performing underwriting functions. See HUD Handbook 4000.1, I.A.6.h; HUD Handbook 4060.1, 2-22.

QUI TAM COMPLAINT - 50

281.   This help ensures that the independent judgment of an underwriter is not influenced by origination goals.

282.   Contrary to these rules and regulations, AFN allowed its sales employees to override underwriting employees.

283.   These practices included AFN allowing its loan officers and branch managers to remove or waive conditions; allowing loan officer and branch managers to change conditions in the AUS system without notifying underwriting employees; and allowing loan officers and branch managers to threaten, pressure, and intimidate underwriting employees.

284.   Relator witnessed AFN engage in this conduct starting at the beginning of her employment with AFN and continuing throughout her employment, and occurring on nearly a daily basis.

285.   Consistent with AFN's goals, AFN's subordination of underwriting management to the sales staff was meant to, and did in fact, result in the endorsement of loan applications in which the applicant's qualifications did not conform to the government's requirements yet still received government insurance.

286.   Given that AFN knew, or should have known, that having the sales force manage underwriting decisions would result in the endorsement of non-qualified applicants, regardless of the regulations' requirements, AFN's conduct was improper for a Direct Endorsement lender.

QUI TAM COMPLAINT - 51

***AFN falsely represented to the government that it was not manipulating variables in the AUS/Total system in order to endorse FHA loans for unqualified buyers.***

287.   As described above, the government has a credit-rating algorithm maintained by the FHA known as TOTAL Mortgage Scorecard—that works in conjunction with AFN's automated underwriting system ("AUS")—to obtain "accept/approve" ratings for its FHA loans.

288.   TOTAL rates loans as either "accept/approve" or "refer" based on data points that AFN enters into its AUS, including, for example, the dollar value of the borrowers' income and assets.

289.   Loans that receive an "accept/approve" rating are subject to less stringent documentation requirements and underwriter scrutiny than loans that receive a "refer" rating.

290.   Direct Endorsement Lenders are not permitted to manipulate the information they enter into an AUS/TOTAL to determine what specific variable amounts would result in an "accept/approve" rating.

291.   Because TOTAL cannot analyze data that is not available to it, certain loans are not eligible for AUS approval and must be manually underwritten.

292.   "A manual downgrade becomes necessary if additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a mortgage otherwise rated as an accept or approve." FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.

QUI TAM COMPLAINT - 52

293. While a lender is not required to have a DE underwriter review the credit portion of an AUS approved loan, a lender must have qualified staff review AUS approvals to ensure a loan that receives an "Accept/Approve" decision is in fact eligible for an AUS approval.

294. To ensure the integrity of TOTAL's decision, as well as the integrity of the data TOTAL relies upon, lenders are prohibited from "manipulating . . . application variables [in] TOTAL mortgage scorecard to obtain an accept/approve classification." *See* Mortgagee Letter 2005-15; HUD Handbook 4000.1, II.A.4.a.iii(A)(1) and II.A.4.a.iv; HUD Handbook 4155.1, 6.A.c.

295. If TOTAL does not approve a loan with an "Accept/Approve" decision, it returns a "Refer" decision, meaning the loan is referred back to the lender for manual underwriting.

296. Lenders must then have a DE underwriter perform a manual underwrite and determine if the loan is approvable under the FHA's manual underwriting requirements. *See* 24 C.F.R. § 203.255(b)(5)(i)(B).

297. For example, if a Direct Endorsement Lender receives a "refer" rating after entering all relevant data points into an AUS/TOTAL, the lender may not then enter hypothetical income or asset amounts (i.e., income or asset amounts that lack a factual basis) in an effort to determine what level of income or assets would generate an "accept/approve" rating.

298. Rather, as made clear by the 4000.1 Handbook, "If a determination is

QUI TAM COMPLAINT - 53

made that the Mortgage must be downgraded to manual underwriting, the Mortgagee must cease its use of the AUS and comply with all requirements for manual underwriting when underwriting a downgraded Mortgage." *See* HUD Handbook 4000.1, II.A.4.a.vi. *See also* HUD Handbook 4155.1, 6.A.1.c.

299.   The prohibition on entering unsubstantiated data points into an AUS/TOTAL exists, among other reasons, to protect against fraud.

300.   TOTAL is not to be used by sales people to manipulate fake variables in attempt to figure out how to get an "approve" score from the system.

301.   For instance, if a Direct Endorsement Lender entered factually unsupported income or asset amounts into an AUS—and thereby determined the precise amount of income or assets necessary to obtain an "accept/approve" rating from TOTAL the lender could falsify loan documents to state that the borrower possesses the required amount of income or assets.

302.   That is why the regulations require that a Mortgagee's employees cease using the system as soon as the result is a "refer." *See* HUD Handbook 4000.1, II.A.4.a.iv(c); HUD Handbook 4155.1, 6.A.1.c.

303.   As part of its scheme to approve government loans that it was presented, AFN systematically manipulated the data that was entered into AFN's AUS/TOTAL system to determine variables that would lead to an "accept/approve" rating from TOTAL.

304.   Thus, in order to get around a "refer" rating from AUS, AFN would

QUI TAM COMPLAINT - 54

manipulate AUS by isolating one or more variables (e.g., the borrower's income) and slightly yet systematically increase or decrease the variable(s) during successive AUS/TOTAL runs over a short period of time to identify the variable amount(s) that would result in an "accept/approve" rating, even though the financial situation of the borrower had not changed between the runs.

305.    After identifying the qualifying variable amount(s), AFN's employees would then communicate that information to the borrower, thus inviting the borrower to create and submit fraudulent documents reflecting the qualifying variable amount(s).

306.    There is simply no legitimate, fiduciary basis to re-run AUS multiple times on the same loan file unless the lender is attempting to manipulate the system even though the financial situation of the borrower had not changed between these runs.

307.    Relator witnessed AFN manipulate the AUS findings to obtain accept/approval of files starting at the beginning of her employment with AFN, and continuing throughout the duration of her employment.

308.    Relator is aware that in one instance, AFN ran the AUS approximately 100 times before obtaining an accept/approve status for the loan.

309.    AFN ran the AUS multiple times in order to deliberately obtain "approve" status from the AUS, as opposed to "refers" that would have required much more stringent underwriting.

QUI TAM COMPLAINT - 55

***AFN falsely certified to the government that it was not hiding adverse documentation that should be included in FHA files.***

310.    AFN falsely certified to the government that it was not hiding documents that needed to be included in the loan files, even though AFN knew that it was hiding such documents.

311.    Additionally, FHA regulations require that underwriting decisions be based on all the required documents in the applicants file.

312.    Derogatory, as well as supportive, documents are to be considered in the process and all red flags must be evaluated.

313.    Further, a mortgagee is required to maintain all such documents in the loan file, both to properly determine the borrower's eligibility, as well as to be available for future review for internal quality assurance purposes, and government audits.

314.    These documents should have remained part of the loan file and not be deleted.

315.    Despite these requirements, AFN frequently placed adverse documentation in a "trash file" to avoid including certain documents in the underwriting of a loan.

316.    These derogatory records should have been part of the decision to have a file approved, and by not including them, AFN approved government loans that otherwise would not have been approved and also made it appear that the files were

QUI TAM COMPLAINT - 56

legitimate.

317.  Instead, by making the files invisible, AFN made it seem as though these documents never existed and the loan file actually qualified for government insurance.

318.  Relator witnessed AFN omitting and hiding adverse documents starting at the beginning of her employment and continuing throughout the duration of her employment with AFN.

319.  Even though AFN knew it was doing so, it falsely certified to the government that it was not.

### *AFN's False Certifications Regarding Individual Loans*

320.  AFN falsely certified that statements made in the application for insurance were true and accurate and that all conditions had been satisfied.

321.  A number of its mortgages did not qualify for government insurance because they were not underwritten in accordance with HUD or VA guidelines, AFN had not used due diligence in underwriting them, AFN entered data into its AUS that lacked integrity, and AFNailed to satisfy AUS conditions before closing and endorsing the mortgages for government insurance.

322.  As a result of the foregoing conduct, AFN submitted numerous false claims to HUD and the VA for insurance on defaulted loans that were ineligible for such insurance.

323.  The following are examples are non-exhaustive and only small set of

examples of the loans which AFN improperly approved and submitted for FHA insurance.

324.  AFN intentionally improperly calculated borrowers' income related to overtime and bonus earnings, allowing AFN to inflate borrowers' incomes.

325.  As another example, AFN knowingly used fraudulent rental and housing payment histories to falsify borrowers' creditworthiness.

326.  AFN also did not properly verify borrowers' income and employment status, allowing AFN to improperly inflate borrowers' incomes.

327.  AFN also knowingly miscalculated the effective income of employees whose were paid hourly but whom had inconsistent hours.

328.  As yet another example, AFN knowingly failed to deduct unreimbursed business expenses from the net income calculations of self-employed borrowers to inflate borrower incomes in order to obtain approvals of lonas.

329.  AFN also failed to written letters of explanation from borrowers with major indications of derogatory credit.

330.  As another example, AFN failed to obtain donor bank statements to verify gift fund assets.

331.  Each of the above examples is a violation of the Government underwriting rules and regulations.

332.  Despite these regulations, AFN underwrote mortgages for properties, approved and endorsed loans for Government insurance, and certified that that the

QUI TAM COMPLAINT - 58

underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, and that the loans complied with all Government requirements, and was eligible for insurance.

333.   Contrary to AFN's certifications, AFN did not use due diligence to underwrite these loans and the AFN did not comply with the Government's requirements in underwriting and approving the loans for Government insurance.

334.   Relator witnessed AFN fraudulently submit loans for Government insurance despite the defects listed above throughout her employment with AFN, beginning immediately after she was hired by AFN and continuing throughout her employment.

### *AFN failed to maintain an adequate quality control program.*

335.   A Direct Endorsement Lender is required to maintain a quality control program to ensure the quality of its government-insured mortgages.  HUD requires that "[t]he Quality Control function must be independent of the [lender's] origination and servicing functions."  HUD Handbook 4060.1, REV-2, ch. 7-3.B; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.A.

336.   The quality control program must be designed to meet the goals of assuring compliance with FHA's requirements, protecting FHA from unacceptable risk, guarding against errors, omissions and fraud, and assuring swift and appropriate corrective action.  HUD Handbook 4060.1, REV-2, ch. 7-2.   The quality control program also must review a sample of all closed loan files to ensure they were

QUI TAM COMPLAINT - 59

underwritten in accordance with HUD guidelines. HUD Handbook 4060.1, REV-2, ch. 7-6.C; see also HUD Handbook 4700.2, REV-1, ch. 6-1.D.

337. When a lender reviews a loan file for quality control, the lender must, among other things, review and confirm specific pieces of information.

338. For instance, "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written reverification. Examples of items that must be reverified include, but are not limited to, the mortgagor['s] employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.; *see also* HUD Handbook 4700.2 REV-1, ch. 6-3.A.2.

339. If the lender finds discrepancies, it must explore them to ensure that there are no deficiencies. "Any discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.

340. At the end of the quality control review, the lender is expected to assess the significance of any deficiencies. The HUD Handbook recommends a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month['s] sample to previous samples so the mortgagee may conduct trend analysis." HUD Handbook 4060.1, REV-2, ch. 7-4.

QUI TAM COMPLAINT - 60

341.  HUD recommends four types of ratings. The ratings provided for this purpose are:

- "Low Risk", i.e., no problems or minor problems were identified with loan servicing or origination;

- "Acceptable Risk," i.e., the issues identified were not material to the "creditworthiness, collateral security or insurability of the loan";

- "Moderate Risk," i.e., a failure to address significant unresolved questions or missing documentation has created moderate risk for the mortgagee and the FHA; and

- "Material Risk," i.e. the issues identified were "material violations of FHA or mortgagee requirements and represent an unacceptable level of risk."

342.  Examples of "material risk" are violations that include a "significant miscalculation of the insurable mortgage amount or the applicant['\]s capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud." HUD Handbook 4060.1, REV-2, ch. 7-4.D.

343.  These findings trigger mandatory reporting obligations. Mortgagees "must report [Material Risk] loans, in writing," to HUD. *Id.*

344.  A lender is also required to report to HUD "[f]indings of fraud or other serious violations" that are discovered "during the normal course of business and by quality control staff during review/audits of FHA loans." HUD Handbook 4060.1, REV-2., ch. 7-3.J. *See also* HUD Handbook 4000.1, V.A.2.d.iv; HUD Handbook 4155.2, 1.B.8.a, I.B.8.b and I.B.8.c.

QUI TAM COMPLAINT - 61

345.   The lender must report these findings, along with the supporting documentation, within 60 days of when the lender first discovers them. *Id.*; HUD Handbook 4060.1, REV-2, ch. 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.").

346.   Since November 2005, Direct Endorsement Lenders such as AFN have been required to make such reports through HUD's online Neighborhood Watch Early Warning System. *See* Mortgagee Letter 2005-26.

347.   Internal reporting of findings is also required.

348.   Quality control review findings must "be reported to the mortgagee['s] senior management within one month of completion of the initial report" HUD Handbook 4060.1, REV-2, ch. 7-3.I.

349.   In addition to appropriate reporting, lenders must act to address the problems they identify.

350.   "Management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify actions being taken, the timetable for their completion, and any planned follow-up activities." *Id.*; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.F.

351.   Despite these programmatic requirements, AFN failed to provide underwriting staff with training and feedback on underwriting errors.

352.   AFN also failed to self-report instances of fraud and misconduct by employees as required under the Government regulations.

QUI TAM COMPLAINT - 62

353. Consistent with AFN's goals, AFN's lack of a sufficient quality control process was designed to, and did result in, the endorsement of loan applications that did not meet governmental requirements.

354. Given that AFN knew, or should have known, that a lack of a quality control process and training did result in the endorsement of non-qualified applicants, regardless of the regulations' requirements, AFN's conduct was improper for a Government lender.

**AFN knowingly made false statements to the government in regards to the quality of AFN's underwriting process and the quality of AFN's endorsed loans.**

355. AFN did not want the government to know that it was underwriting files illegally, or that AFN was breaking its contractual agreements.

356. AFN therefore made false statements to the government to induce the government to extend insurance coverage on home loans, as well as pay for losses on covered loans.

357. AFN made these false certifications repeatedly in regards to its underwriting process.

358. Each false certification independently triggers AFN's liability.

359. In addition, the purpose, as well as the actual outcome, of AFN's improper practices of paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage

QUI TAM COMPLAINT - 63

origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; excluding and hiding adverse documentation; and failing to maintain an adequate quality control program was to push AFN's employees to endorse loans in which the applicant fell below government's requirements for insuring the loans as described in ¶¶ 132–87.

360.    AFN's illegal policies and practices therefore induced these knowing, false statements set forth in ¶¶ 132–87 AFN is independently liable for such false statements knowingly induced by its commission pay plan.

*Annual certifications*

361.    As set forth above, AFN submitted an annual certification to HUD in every year that it was a member of the Direct Endorsement Lender program.

362.    For fiscal years 2013-2016 AFN annually certified to the federal government that the operations of AFN had been, and was, in conformance with all applicable HUD-FHA regulations and handbooks.

363.    From the years 2016 to the present AFN annually certified to the federal government that the operations of AFN had been, and were, in conformance with HUD Handbook 4000.1 Sections I and V, and any agreements between AFN and HUD.

364.    However, AFN was not in compliance with these HUD-FHA requirements in a number of ways.

QUI TAM COMPLAINT - 64

365. For example, AFN made false, specific representations about the quality of the services they were providing.

366. AFN annually certified they were providing HUD-FHA compliant underwriting services when they knew they did not, and had no intention of providing such services.

367. Among other things AFN knew this statement was false because AFN was paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; excluding and hiding adverse documentation; and failing to maintain an adequate quality control program, even though AFN contracted not to engage in such conduct and the government regulations forbade AFN from engaging in such practices.

368. Additionally, AFN knew this statement was false because AFN had been, and intended to continue, its policies and practices of: paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work

QUI TAM COMPLAINT - 65

backwards" to find values that would allow a loan to be approved; excluding and hiding adverse documentation; and failing to maintain an adequate quality control program, even though AFN contracted not to engage in such conduct and HUD-FHA regulations forbade AFN from engaging in such practices.

369.   AFN was also not in compliance with all HUD-FHA requirements because they knowingly endorsed loans that fell below the HUD-FHA requirements.

370.   This included improper calculations of borrowers' income related to overtime and bonus earnings to inflate borrowers' incomes; using fraudulent rental and housing payment histories to establish borrower creditworthiness; failing to obtain the proper verifications of employment; improperly calculating the effective income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not regularly working at least forty hours in a week; failing to deduct unreimbursed business expenses from the net income calculations of self-employed borrowers; intentionally omitting student loan debts; failing to obtain written letters of explanation from borrowers with major indications of derogatory credit; and failing to obtain donor bank statements to verify gift fund assets.

371.   Thus, when AFN stated in its annual certification that its operations conformed to HUD-FHA requirements, AFN knew this statement was false because AFN had (and intended to continue) to endorse such deficient files.

372.   These representations on the annual certifications were designed by

1  AFN to, and in fact cause, the government to extend government funded insurance

2  coverage and pay insurance claims on non-conforming home loans.

3       373.  In submitting these annual certifications, AFN did not disclose its non-

4  compliance with these important regulatory and contractual requirements which

5  made AFN's certifications false statements.

6  ***Loan-level certifications***

7       374.  As set forth above, for each FHA loan AFN endorsed, AFN also

8  certified that, as to the loan, there was "no defect in connection with my approval of

9  this mortgage," and also certified that, as to that loan, it was not the case that "the

10  mortgage should not have been approved in accordance with FHA requirements."

11  *See* Form HUD 92900-A.

12       375.  Additionally, for each VA loan that AFN endorsed, AFN certified that

13  "all verifications of employment, deposit, and other income and credit verification

14  documents have been processed in compliance with 38 CFR part 36" and that the

15  loan "meets the underwriting standards recited in chapter 37 of title 38 United Sates

16  Code and 38 CFR part 36."

17       376.  Although AFN, through its employees and agents, certified that the

18  process to approve the loan had "no defect," had that the loan itself had been

19  approved "in accordance with FHA requirements," AFN knew such certification on

20  those loans was not accurate.

21       377.  AFN submitted these false loan-level certifications on virtually every

QUI TAM COMPLAINT - 67

business day from at least 2013 to the present.

378.   Among other things, as discussed above, AFN knew this statement was false because AFN had a defective underwriting process in place for the approval of the mortgage and that the loan itself did not meet the governmental requirements.

379.   Specifically, AFN knew that, among other things, AFN was paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; excluding and hiding adverse documentation; and failing to maintain an adequate quality control program, and doing so even though AFN contracted not to engage in such conduct and the government regulations forbade AFN from engaging in such practices.

380.   In addition, as a result of AFN's scheme to push though unqualified loans, AFN endorsed loan files that did not qualify under the government's underwriting requirements.

381.   This included improper calculations of borrowers' income related to overtime and bonus earnings to inflate borrowers' incomes; using fraudulent rental and housing payment histories to establish borrower creditworthiness; failing to obtain the proper verifications of employment; improperly calculating the effective

QUI TAM COMPLAINT - 68

income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not regularly working at least forty hours in a week; failing to deduct unreimbursed business expenses from the net income calculations of self-employed borrowers; intentionally omitting student loan debts; failing to obtain written letters of explanation from borrowers with major indications of derogatory credit; and failing to obtain donor bank statements to verify gift fund assets.

382.    Therefore, AFN's statement on the loan-level certification, that the loan met all government requirements, was false.

383.    Among other things AFN knew this statement was false because AFN knowingly made improper calculations of borrowers' income related to overtime and bonus earnings to inflate borrowers' incomes; used fraudulent rental and housing payment histories to establish borrower creditworthiness; failed to obtain the proper verifications of employment; improperly calculated the effective income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not regularly working at least forty hours in a week; failed to deduct unreimbursed business expenses from the net income calculations of self-employed borrowers; intentionally omitted student loan debts; failed to obtain written letters of explanation from borrowers with major indications of derogatory credit; and failed to obtain donor bank statements to verify gift fund assets.

384.    Despite AFN's representations that they were endorsing compliant

QUI TAM COMPLAINT - 69

1  FHA and VA loans, AFN knew they were in fact delivering non-conforming loans
2  to the government.

3  ***Materiality***

4  385.   The false statements by AFN were material in inducing the government
5  to extend insurance coverage to loans endorsed by AFN and to pay claims on
6  government loans that had been endorsed by AFN.

7  ***Annual certifications***

8  386.   As set forth above, the purpose of the regulations, and the purpose of
9  AFN's annual certification that they were following the regulations, was to ensure
10  that AFN's underwriting operations met acceptable underwriting standards for FHA-
11  insured loans.

12  387.   A reasonable person would not have extended loan insurance on a loan
13  file, and certainly not provided it at the lower rates offered in the governmental
14  program, if she knew that AFN was not following the required underwriting process,
15  including paying commissions to employees performing underwriting functions;
16  pressuring employees to approve ineligible loans; allowing managers to make
17  "exceptions" to government-required conditions on files; allowing mortgage
18  origination employees to manage and control underwriting; repeatedly running the
19  automated underwriting system to "work backwards" to find values that would allow
20  a loan to be approved; excluding and hiding adverse documentation; and failing to
21  maintain an adequate quality control program, particularly when AFN was falsely

QUI TAM COMPLAINT - 70

certifying that they were in compliance with the regulations banning such practices.

388. A reasonable person would not have allowed AFN to participate in the DE Program if she knew that AFN was not following the required underwriting process to participate in the Direct Endorsement Program, including important contractual and regulatory requirements such as paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; excluding and hiding adverse documentation; and failing to maintain an adequate quality control program, particularly when AFN was falsely certifying that they were in compliance with the regulations.

389. AFN knew that the government attached importance to these annual certifications that AFN was in compliance with the regulations.

390. Among other things, the government required these annual certifications before extending insurance coverage to AFN's endorsed loans, and before allowing AFN to participate in the Direct Endorsement Program.

391. Further, the regulations define such violations as "material."

392. The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government and AFN: AFN

QUI TAM COMPLAINT - 71

would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to AFN's loans based on AFN's accurate representation that they had followed the regulatory and contractual requirements in endorsing the loans, including not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; not allowing managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; not excluding and hiding adverse documentation; and maintaining an adequate quality control program.

393.    Therefore the government was expressly clear that a condition of extending insurance coverage to AFN's endorsed loans, and the government's ultimate payment on any losses was that AFN annually certify its compliance with the regulations, including not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; not allowing managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; not excluding and hiding adverse documentation; and maintaining an adequate quality control

QUI TAM COMPLAINT - 72

program.

394.    The government, in reliance on these false statements by AFN in its certifications to the government, extended FHA insurance coverage to the FHA home loans endorsed by AFN.

395.    The government extended that insurance based on AFN's certification that they are in compliance with all government regulations, including not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; not allowing managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; not excluding and hiding adverse documentation; and maintaining an adequate quality control program.

396.    Without AFN's certification, the government would not have allowed AFN to participate in the Direct Endorsement Program, as AFN knew.

397.    As AFN also knew, the government has on numerous occasions commenced enforcement proceedings against mortgagees who fail to comply with the HUD-FHA regulations.

398.    Without AFN's certification, the government would not have extended insurance coverage to files endorsed by AFN, and certainly not at the rates guaranteed by the government.

QUI TAM COMPLAINT - 73

399.  Without AFN's certification, the government would not have been liable for the insured losses on loans endorsed by AFN and covered by the government.

400.  Had AFN truthfully told the government that AFN was not in compliance with HUD-FHA regulations, and specifically the requirements of not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; not allowing managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; not excluding and hiding adverse documentation; and maintaining an adequate quality control program, AFN would not have been allowed to endorse any loans for the FHA.

### *Loan-level certifications*

401.  As set forth above, the purpose of the regulations, and the purpose of AFN's certifications on each endorsed FHA loan files that there was "no defect in connection with [the] approval of this mortgage," and that it had been "approved in accordance with FHA requirements," was to was to ensure that AFN was providing conforming FHA underwriting services to the government.

402.  Similarly, the purpose of AFN's certifications on each VA loan that it endorsed that "all verifications of employment, deposit, and other income and credit

QUI TAM COMPLAINT - 74

verification documents have been processed in compliance with 38 CFR part 36" and that the loan "meets the underwriting standards recited in chapter 37 of title 38 United Sates Code and 38 CFR part 36" was to ensure that AFN was providing conforming VA underwriting services to the government.

403.   A reasonable person would not have extended loan insurance, and certainly not provided it at lower rates offered in the governmental program, if she knew that there were defects in regards to the underwriting process as it relates to the approval of the mortgage, and that the approval had not been in accordance with government requirements, including defects such as improper calculations of borrowers' income related to overtime and bonus earnings to inflate borrowers' incomes; using fraudulent rental and housing payment histories to establish borrower creditworthiness; failing to obtain the proper verifications of employment; improperly calculating the effective income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not regularly working at least forty hours in a week; failing to deduct unreimbursed business expenses from the net income calculations of self-employed borrowers; intentionally omitting student loan debts; failing to obtain written letters of explanation from borrowers with major indications of derogatory credit; and failing to obtain donor bank statements to verify gift fund assets, particularly when AFN was falsely certifying that was not occurring.

404.   AFN knew that the government attached importance to these loan-level

QUI TAM COMPLAINT - 75

certifications that there were no defects in regards to the approval of the mortgage and they had been approved in accordance with government requirements.

405.    Among other things, the government required these certifications before extending insurance coverage to AFN's endorsed loans.

406.    The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government and AFN: AFN would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to AFN's loans based on AFN's accurate representation that they had followed the regulatory and contractual requirements in endorsing the loans, including not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; not allowing managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; not excluding and hiding adverse documentation; and maintaining an adequate quality control program.

407.    Therefore the government was expressly clear that a condition of extending insurance coverage to AFN's endorsed loans and ultimate payment on any losses was that AFN's loan certifications that there were no defects in regards to the approval of the mortgage and it had been approved in accordance with government

QUI TAM COMPLAINT - 76

requirements, including properly calculating borrowers' income; properly establishing borrower creditworthiness; obtaining the proper verifications of employment; properly deducting unreimbursed business expenses from the net income calculations of self-employed borrowers; including student loan debts in the calculation of debt obligations; obtaining the satisfactory written letters of explanation from borrowers with major indications of derogatory credit; and obtaining the proper bank statements to verify gift fund assets.

408.   The government, in reliance on these false statements by AFN in its certifications to the government, extended FHA and VA insurance coverage to the FHA and VA home loans endorsed by AFN.

409.   The government extended that insurance based on AFN's loan-level certification that were no defects in the underwriting process and that the loans had been approved in accordance with government requirements, including properly calculating borrowers' income; properly establishing borrower creditworthiness; obtaining the proper verifications of employment; properly deducting unreimbursed business expenses from the net income calculations of self-employed borrowers; including student loan debts in the calculation of debt obligations; obtaining the satisfactory written letters of explanation from borrowers with major indications of derogatory credit; and obtaining the proper bank statements to verify gift fund assets.

410.   Without AFN's loan-level certification, the government would not have extended insurance coverage to files endorsed by AFN, as AFN knew, and certainly

QUI TAM COMPLAINT - 77

not at the rates guaranteed by the government.

411.   Without AFN's loan-level certification, as AFN knew, the government would not have been liable for the insured losses on loans endorsed by AFN and covered by the government.

412.   Had AFN truthfully told the government that there were defects in regards to the approval of the mortgage and it had not been approved in accordance with government requirements, and specifically including properly calculating borrowers' income; properly establishing borrower creditworthiness; obtaining the proper verifications of employment; properly deducting unreimbursed business expenses from the net income calculations of self-employed borrowers; including student loan debts in the calculation of debt obligations; obtaining the satisfactory written letters of explanation from borrowers with major indications of derogatory credit; and obtaining the proper bank statements to verify gift fund assets.

413.   In addition, the purpose, as well as the actual outcome, of AFN's underwriting operations was to have AFN's employees endorse loans in which AFN knew the applicant fell below government's requirements for insuring the loans as described in ¶¶ 152–65 and 179–87.

414.   AFN's illegal policies and practices therefore induced material false representations to the government as set forth in ¶¶ 132–87 and AFN is independently liable for such materially false statements knowingly induced these practices.

QUI TAM COMPLAINT - 78

415. Additionally, the endorsement of unqualified borrowers also constituted a material false statement on the loan-level certifications.

416. A reasonable person would not have extended loan insurance on and endorsed loan, and certainly not provided it at lower rates offered in the governmental program, if she knew that the borrower was not qualified for the loan as wrongly certified by AFN.

417. AFN knew that the government attached importance to these loan-level certifications that the loan files accurately reflected that the borrower was qualified for the mortgage.

418. Without AFN's certification, the government would not have allowed AFN to participate in the Direct Endorsement Program, as AFN knew.

419. Among other things, the government required these certifications before extending insurance coverage to AFN's endorsed loans.

420. The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government AFN: AFN would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to AFN's loans based on AFN's accurate representation that they had followed the regulatory and contractual requirements in endorsing the loans, including not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; not allowing

QUI TAM COMPLAINT - 79

managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; not excluding and hiding adverse documentation; and maintaining an adequate quality control program.

421. Therefore the government was expressly clear that a condition of extending insurance coverage to AFN's endorsed loans, and ultimate payment on any claims, was that AFN's loan-level certifications were accurate, and specifically that the applicant was qualified for the loan.

422. The government, in reliance on these false statements by the AFN in its loan-level certifications to the government, extended government insurance coverage to the government home loans endorsed by AFN.

423. The government extended that insurance based on AFN's certification that the information provided about the applicant was accurate, and that the applicant met the government's criteria.

424. Without AFN's loan-level certification, the government would not have extended insurance coverage to files endorsed by AFN, as AFN knew, and certainly not at the rates charged by the government.

425. Without AFN's loan-level certification, the government would not have been liable for the insured losses on loans endorsed by AFN and covered by the government.

QUI TAM COMPLAINT - 80

426.   Had AFN truthfully told the government that the information in the file was not accurate, and that the applicant was not qualified, the government would not have insured AFN's endorsed loan files.

**Claims on the government**

427.   655.   The False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

428.   The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

429.   As set forth above, loans endorsed by AFN caused the government to sustain claims against it.

QUI TAM COMPLAINT - 81

430. Had AFN truthfully certified to the government that it was not in conformance with governmental underwriting requirements, the government would not have insured these loans and would not have been liable for claims arising from these improperly approved loans.

431. Similarly, had AFN not knowingly and falsely certified to the government that there was no defect in connection with the improperly approved mortgage, the government would not have insured any of it loans and would not have been liable for claims arising from these improperly approved loans.

432. By endorsing ineligible mortgages for FHA insurance AFN fraudulently induced the United States to enter into a mortgage insurance contract that it would not have otherwise entered into, rendering the subsequent claim for mortgage insurance false as a matter of law.

433. Another independent way in which AFN triggered claims against the government was through the government payments of losses on any of AFN's loans.

434. Had AFN not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured any of AFN's loans and thus would not have been liable for claims arising from any of AFN's loans.

435. Another independent way in which AFN triggered claims against the government was through the government subsidized insurance that the government provided to all of the loans endorsed by AFN, subsidized insurance which constitutes

a "claim" under the FCA.

436.    Had AFN not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured AFN's loans and thus would have provided the government subsidized insurance to AFN's governmental loans.

437.    Similarly, had AFN not knowingly and falsely certified to the government that there was no defect in connection with improperly approved mortgages, the government would not have insured those loans and would not have been liable for claims arising from these improperly approved loans.

438.    Another independent way in which AFN triggered claims against the government was through the lower premium rates charged on AFN's loans.

439.    The premium rates charged by the government are premised on mortgagees only endorsing loans that meet governmental requirements.

440.    Had AFN not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured AFN's loans at the rates it did.

441.    Similarly, had AFN not knowingly and falsely certified to the government that there was no defect in connection with improperly approved mortgages, the government would not have insured AFN's loans at the rates it did.

442.    Thus, AFN triggered a claim against the government by having its loans insured at lower premium rates than was justified.

QUI TAM COMPLAINT - 83

443.   Another independent way in which AFN triggered claims against the government was through the additional administrative costs to the government on loans that had been endorsed by AFN.

444.   Had AFN not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have borne the additional administrative costs from servicing and supporting AFN's loans.

### FIRST CAUSE OF ACTION
### 31 U.S.C. § 3729(a)(1)(A)
### Causing False Claims

445.   The United States repeats and realleges the allegations above as if fully set forth herein.

446.   The Government seeks relief against AFN under 31 U.S.C. § 3729(a)(1)(A) of the False Claims Act.

447.   As set forth above, AFN knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented or caused to be presented, to an officer or employee of the Government, false and fraudulent claims for payment or approval in connection with its endorsement of government-insured mortgages.

448.   The Government paid insurance claims, and incurred losses, related to government-insured mortgages wrongfully endorsed by AFN because of AFN's wrongful conduct.

449.   By endorsing ineligible mortgages for FHA insurance AFN

QUI TAM COMPLAINT - 84

fraudulently induced the United States to enter into a mortgage insurance contract that it would not have otherwise entered into, rendering the subsequent claim for mortgage insurance false as a matter of law.

450.   By reason of the false claims of AFN, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each false statement.

## SECOND CAUSE OF ACTION
### 31 U.S.C. § 3729(a)(1)(B)
### Use of False Statements

451.   The United States repeats and realleges the allegations above as if fully set forth herein.

452.   The Government seeks relief against AFN under 31 U.S.C. § 3729(a)(1)(B) of the False Claims Act.

453.   As set forth above, AFN knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with AFN's endorsement of government-insured mortgages.

454.   The Government paid insurance claims, and incurred losses, related to government-insured mortgages wrongfully endorsed by AFN because of AFN's wrongful conduct.

455.   By making false statements, AFN fraudulently induced the United States to enter into a mortgage insurance contract that it would not have otherwise

QUI TAM COMPLAINT - 85

entered into, rendering the subsequent claim for mortgage insurance false as a matter of law.

456.    By reason of the false claims of AFN, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each false statement.

### THIRD CAUSE OF ACTION
### 31 U.S.C. § 3729(a)(1)(G)
### Reverse False Claims

457.    United States repeats and realleges the allegations above as if fully set forth herein.

458.    The Government seeks relief against AFN under 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act.

459.    As set forth above, AFN knowingly made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

460.    The Government paid insurance claims, and incurred losses, relating to government-insured mortgages wrongfully endorsed by AFN because of AFN's wrongful conduct.

461.    By virtue of the false records or statements made by AFN, the Government suffered damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by each false statement.

QUI TAM COMPLAINT - 86

**WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:**

a.    A judgment against AFN in an amount equal to three times the amount of damages the United States has sustained as a result of AFN's violations of the False Claims Act;

b.    A judgment against AFN for civil penalties as described (and adjusted for inflation) under 31 U.S.C. § 3729(a)(1)(G) for each of AFN's violations of the False Claims Act;

c.    That Relator recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

d.    That Relator be awarded all reasonable attorneys' fees in bringing this action;

e.    That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

f.    That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

g.    That a trial by jury be held on all issues so triable;

h.    An award of pre-judgment interest; and

i.    Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

QUI TAM COMPLAINT - 87

1

## JURY TRIAL DEMAND

2      Pursuant to Rule 38 of the Federal Rules of Civil Procedure or any similar

3   rule or law, Plaintiff demands a trial by jury for all causes of action and issues for

4   which trial by jury is available.

5      Dated: March 8, 2019.

6   **LAW OFFICE OF THOMAS G. JARRARD, PLLC**

7   */s/    Thomas G. Jarrard*
    Thomas G. Jarrard
8   1020 N. Washington Street
    Spokane, WA 99201
9   Tel: (425) 239-7290
    Email: tjarrard@att.net
10

11  **THOMAS & SOLOMON LLP**

12  */s/ J. Nelson Thomas*
    J.  Nelson Thomas, Esq., *pro hac vice pending*
    Michael J. Lingle, Esq., *pro hac vice pending*
13  Jonathan W. Ferris, Esq., *pro hac vice pending*
    693 East Ave
14  Rochester, New York 14607
    Telephone: (585) 272-0540
15
    *Attorneys for Relator*
16

17

18

19

20

21

QUI TAM COMPLAINT - 88